# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL WAKEFIELD,<br><br>             Plaintiff,<br><br>     v.<br><br>JAMES E. TILTON, et al.,<br><br>             Defendants.<br>_____/ | CASE NO. 1:07-cv-01802-OWW-GSA PC<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM<br><br>(Doc. 24)<br><br>OBJECTIONS DUE WITHIN THIRTY DAYS |

**Findings and Recommendations on Defendant's Motion to Dismiss**

**I.     Procedural and Factual Background**

Plaintiff Darryl Wakefield, a state prisoner in the Security Housing Unit ("SHU") of California State Prison Corcoran ("CSPC"), is proceeding *pro se* and in *forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that by denying plaintiff's request for daily showers, defendant Richard Indermill, the Protestant chaplain at CSPC, violated plaintiff's constitutional right to free exercise of his religious beliefs.[1]  Indermill is the sole remaining defendant in this action following screening pursuant to 28 U.S.C. § 1915A.

According to the allegations in plaintiff's complaint, SHU Residents at CSPC are provided with an opportunity to shower three times each week.  Because of the high security requirements in the SHU, which houses inmates presenting disciplinary or security concerns, five

---

[1] Plaintiff does not raise a claim under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc.

1

correctional officers are required to provide inmate showers: four officers "on the floor" to cuff and escort inmates from their cells to the shower, and one officer in the control booth to open and close cell doors.  Conducted during the third watch (2:00 p.m. to 10:00 p.m.), showers are provided to each of the two tiers of cells on alternate days from 2:30 p.m. to 9:00 p.m., with no showers being provided on Sundays.

Plaintiff incorporates excerpts and articles indicating that a Seventh Day Adventist ought to wash his or her body regularly.  Because plaintiff finds bathing in his cell's sink (in prison parlance, a "bird bath") to be messy and inconvenient, plaintiff maintains that a bird bath does not satisfy his personal need to wash daily.  In his complaint, plaintiff candidly states that he concluded that daily showers were required after reading and studying various church publications and that the church hierarchy does not necessarily agree with his interpretation of those sources. Curiously, however, plaintiff states in his motion brief:

> I Plaintiff <u>have</u> <u>never</u> <u>asserted</u> daily showers is based on my own individual interpretation of the Seventh-Day Adventist religion and is not shared by the District representatives of the Seventh-Day Adventist church (hereafter SDA), as Defendant claims.
> My interpretation is based on SDA teachings by Ellen G. White . . . . . These are SDA church teachings which we members follow.

Pb3.

Consistent with the results of defendant's inquiries to Seventh Day Adventist leaders, all of whom denied the existence of any requirement that SDA members shower daily, plaintiff's supporting materials, incorporated into his complaint by reference, do not mention a requirement of daily showers for practicing Seventh Day Adventists.  For the most part, the various religious tracts included as exhibits and incorporated into plaintiff's complaint and motion brief generally advocate various aspects of a healthy lifestyle that includes regular bodily hygiene.  None set forth a requirement for a daily tub bath or shower.   For example, one source reads, "Persons in health should on no account neglect bathing.  They should by all means bathe as often as twice a week." Trustees of Ellen G. White Publications, <u>Counsels on Health</u> at 1031 (Ellen G. White Publications 1957), *quoting* Ellen G. White, <u>Testimonies for the Church</u>, vol. 3, pp. 70-71 (1871).  Advising parents in another treatise, Ms. White stated, "Most persons would benefit

from a cool or tepid bath every day." Trustees of Ellen G. White Publications, <u>Child Guidance</u> (Ellen G. White Publications, date unknown), *quoting* Ellen G. White, <u>Ministry of Healing</u> at 276 (1905).

Believing that the recipients of certain mental health services are entitled to daily showers, plaintiff initially sought daily showers as a recipient of such services. His request was denied since daily showers are provided only to mental health recipients housed in a location other than the SHU. After his prison grievance was denied at the first level of appeal, plaintiff added a claim at the second level of appeal that his religious beliefs mandated daily showers. The appeals coordinator then referred the religion-based request to CSPC's Religious Review Committee, which is charged with resolving inmate requests for accommodation of religious beliefs. (The request based on mental health services was ultimately denied at the director's level but is no longer at issue in this case.) Defendant denied plaintiff's appeal for religious accommodation:

> This memo is in regards to your appeal in which you are requesting to take daily showers as part of your religious faith group. Your appeal is denied at this level. I consulted with three different District Representatives of your faith group, Seventh Day Adventist, and all three said that showering daily is not a requirement for their faith group. This was also reviewed by this institution's Religious Review Committee and your appeal is denied.

Exhibit C to complaint.

Plaintiff filed a § 1983 action appealing both decisions on December 12, 2007 (Doc. 1). After the court screened the complaint pursuant to 28 U.S.C. 1915A, plaintiff agreed to dismiss his other claims and defendants. Despite plaintiff's later attempt to reinstate the dismissed claims and defendants through objections to the Magistrate's Findings and Recommendations, the Order Adopting Findings and Recommendations, and Dismissing Certain Claims and Defendants from Action dismissed the claims and parties according to plaintiff's original agreement (Doc. 16).

On February 18, 2009, defendant filed the pending motion to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 24). Plaintiff filed an opposition on March 12, 2009 (Doc.27), and defendant filed a reply on March 25, 2009 (Doc.29).

3

## II. Standard of Review

In considering a motion to dismiss for failure to state a claim, a court must accept as true the allegations of the complaint in question, construe the pleading in the light most favorable to the party opposing the motion, and resolve all doubts in the pleader's favor. Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 740 (1976); Jenkins v. McKeithen, 395 U.S. 411, 421, reh'g denied, 396 U.S. 869 (1969). "Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions," none of which applies to section 1983 actions. Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512 (2002); Fed. R. Civ. P. 8(a). Pursuant to Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949 (2009), *citing* Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" Iqbal, 129 S.Ct. at 1949, *quoting* Twombly, 550 U.S. at 555.

While factual allegations are accepted as true, legal conclusions are not. Iqbal, 129 S.Ct. at 1949. The statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz, 534 U.S. at 512. A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Id. at 514.

"'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.'" Jackson v. Carey, 353 F.3d 750, 755 (9th Cir. 2003), *quoting* Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). *See also* Austin v. Terhune, 367 F.3d 1167, 1171 (9th Cir. 2004), *quoting* Fontana v. Haskin, 262 F.3d 871, 977 (9th Cir. 2001) ("'Pleadings need suffice only to put the opposing party on notice of the claim . . . .'").

///

The court has a statutory duty to screen complaints in cases brought by inmates proceeding *pro se* and to dismiss prior to service on the defendant(s) any claims that fail to state a claim upon which relief may be granted. 28 U.S.C. § 1915(e)(2); 28 U.S.C. § 1915A. The court did so here, entering a screening order on August 26, 2008, which concluded that plaintiff's complaint stated a cognizable free exercise claim against defendant under the First Amendment to the United States Constitution (Doc. 9). In light of its legal analysis and conclusion, as set forth in the screening order, the court is reluctant to now grant defendant's motion to dismiss for failure to state a claim. Nonetheless, having carefully reviewed plaintiff's complaint and both parties' motion briefs, this court is compelled to change its initial opinion and conclude that the complaint fails to state a valid claim against defendant. In addition, because a right to daily showers is not clearly established, this court must conclude that defendant Indermill is protected by qualified immunity from this lawsuit.

## III. First Amendment – Free Exercise Claim

Plaintiff contends that denying him daily showers violates his First Amendment right to free exercise of his religious beliefs. Defendant moves for dismissal, arguing that, although plaintiff establishes a religious need to wash daily, his alleged facts do not support a conclusion that plaintiff has a right to daily showers outside his cell.

Despite their incarceration, prisoners retain their First Amendment rights, including the right to free exercise of religion. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Bell v. Wolfish, 441 U.S. 520, 545 (1979). Incarceration itself, as well as legitimate correctional goals or security concerns, may limit free religious practice, however. O'Lone, 482 U.S. at 348; McElyea v. Babbit, 833 F. 2d 196, 197 (9th Cir. 1987).

> The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security.

Id. at 197.

///

///

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." O'Lone, 482 U.S. at 349, *quoting* Turner v. Safley, 482 U.S. 78, 84 (1987).

These limitations are especially acute in maximum-security and segregation facilities, such as the SHU, which house prisoners whose conduct endangers the safety of other inmates and prison personnel as well as the prisoner himself. Cal. Admin. Code tit. 15, § 3341.5(c). For example, plaintiff has been confined to the SHU because of his repeated assaults on correctional officers (complaint, Ex. F). In addition, the CSPC SHU is overcrowded; in Fiscal Year 2008-2009, it housed 1426 inmates in space designed for 1204 inmates. Http://www.cdcr.ca.gov/Visitors/Facilities/COR-Institution_Stats.html. In recognition of the dangers present in the SHU, institutional programs and services are allowed only to the extent that they can be reasonably provided within the SHU without endangering the security or safety of persons. Cal. Admin. Code tit. 15, § 3343(k). Accordingly, religious programming may be modified to ensure safety and security. Id. Religious services and counseling are provided on an individual rather than a group basis, and chaplains are required to wear protective vests and face shields. C-OP No. 222, § 603.[2] All religious materials must be inspected or searched by correctional officers before a chaplain may use them in the SHU. C-OP No. 222, §603.

To implicate the Free Exercise Clause, the prisoner's belief must be both sincerely held and rooted in religious belief. Shakur v. Schriro, 514 F.3d 878, 883-84 (9th Cir. 2008). Neither party questions the sincerity of plaintiff's religious beliefs. Nonetheless, to determine the legitimacy of the regulation of a prisoner's religious expression, the court must apply the factors set forth in Turner, 482 U.S. at 89-91 (*citations omitted*), by considering the following questions:

1. Is there a valid, rational connection between the regulated conduct and the legitimate governmental interest put forward to justify it?

2. Do alternative means of exercising the right remain open to prison inmates?

///

---

[2] "C-OP" refers to Corcoran Operational Procedures, which set forth the specific procedures to be applied in CSPC's daily operations. C-OP No. 222, on which plaintiff relies for evidence of SHU inmates' right to religious expression, is a fifty-page document providing detailed procedures for operation of the SHU.

6

      3.      How will accommodation impact guards and other inmates, and the general allocation of prison resources?

      4.      Has the prisoner identified simple alternatives to the regulation that can be implemented at minimal cost to legitimate penological interests?

**Rational connection.** Turner's rational connection prong considers the purpose of the policy underlying the restriction on the prisoner's religious exercise. Friend v. Kolodzieczak, 923 F.2d 126, 128 (9th Cir. 1991). Defendant contends that limiting shower opportunities for SHU inmates is consistent with the security requirements of a segregation facility housing dangerous inmates who do not comply with prison rules. Plaintiff denies a penological objective of maintaining institutional security by avoiding the disruption of providing him with daily showers, arguing that granting him a shower daily cannot be disruptive when showers are being provided to inmates every day but Sunday. In doing so, plaintiff ignores the overriding security concerns that permeate life in the SHU, including such apparently routine matters as showering.

      In itself, the shower procedure set forth in Corcoran OP 222 is religion neutral, designed to ensure safety when a SHU inmate is released from his cell to shower. Anytime a SHU inmate is released from his cell, elaborate security measures are applied. All inmate movements are logged in the daily record. *See, e.g.,* C-OP No. 222, Chapter 400. All SHU staff must wear protective face shields and stab-proof vests when on the SHU tiers, escorting SHU prisoners, or in contact with SHU inmates. C-OP No. 222, §§ 504, 517, 518. In a cell housing two inmates, both must be handcuffed before the cell door is released to allow one inmate to exit. C-OP No. 222, §102 D.7. All inmates must submit to comprehensive unclothed body searches before exiting their cells. C-OP No. 222, §§ 501E and 504 A.2.

      The specific security procedures applicable to inmate showers are similarly detailed and cautious. Two correctional officers must escort each inmate to the shower. C-OP No. 222, §§ 504 A.4 and C.1. The inmate must surrender his towel and permitted hygiene items to the officers for inspection before he is permitted to leave his cell. C-OP No. 222, § 504 C.2. An inmate may request the use of a razor during the shower but must surrender it for inspection before he may leave the shower. C-OP No. 222, §504 C.3. Officers must securely store and dispose of razors. C-OP No. 222, §508.

1    An inmate may remain in the shower for five minutes. C-OP No. 222, §507 C. A
2 disabled inmate is permitted approximately fifteen minutes, with due regard to additional time
3 needed because of his disability. C-OP No. 222, § 507 D. Officers must inspect the showers for
4 contraband or signs of destruction before and after inmate use or cleaning. C-OP No. 222, § 511
5 G.
6    Showers are conducted on the third watch from approximately 1430 hours (2:30 p.m.) to
7 2100 hours (9:00 p.m.). C-OP No. 222, §§ 505 and 507 A. Other activities must occur
8 simultaneously, including yard release, mail call, and the evening meal. C-OP No. 222, § 505.
9 Each inmate is provided with an opportunity to shower three times weekly. Cal. Admin. Code tit.
10 15, §3343(g); C-OP No. 222, § 506 E.
11    The Ninth Circuit has repeatedly upheld policies based on legitimate penological interest
12 in security. *See, e.g.,* Henderson v. Terhune, 379 F.3d 709, 713-714 (9th Cir. 2004) (prohibition
13 of long hair); Anderson v. Angelone, 123 F.3d 1197, 1198-99 (9th Cir. 1997) (prohibition of
14 inmate-led religious services); Ward v. Walsh, 1 F.3d a873, 879 (9th Cir. 1993) (prohibition
15 against use of candles in cells); Friedman v. Arizona, 912 F.2d 328, 331-32 (9th Cir. 1990), *cert.*
16 *denied sub nom Naftel v. Arizona*, 498 U.S. 1100 (1991) (prohibition against beards); Standing
17 Deer v. Carlson, 831 F.2d 1525, 1528-29 (9th Cir. 1987); McCabe v. Arave, 827 F.2d 634, 637
18 (9th Cir. 1987) (prohibition against preaching racial hatred and violence); Allen v. Toombs, 827
19 F.2d 563, 567 (9th Cir. 1987)(prohibition against sweat lodge attendance by Native American
20 prisoners in disciplinary segregation). Actual security problems need not have arisen; evidence
21 of anticipated problems is sufficient. *See* Friedman, 912 F. 2d at 332-33; Standing Deer, 831
22 F.2d at 1528. Here, legitimate security concerns and attendant time constraints combine to
23 establish a rational connection between institutional security concerns and denial of plaintiff's
24 request for daily showers.
25    **Available alternatives.** The relevant question in evaluating the second Turner prong "is
26 not whether the inmate has alternative means of engaging in the particular religious practice that
27 he or she claims is being affected; rather [the court must] determine whether the inmates have
28 been denied all means of religious expression." Ward, 1 F.3d at 877. The court must determine

8

whether, by denying the specific form of observance in question, the inmate has been deprived of "all means of expression." O'Lone, 482 U.S. at 352.  Although much of plaintiff's religious exercise is limited by his incarceration in the SHU, he receives a religious diet, is entitled to individual religious services and counseling, and, as evidenced by the appendices to his complaint and motion brief, has access to a variety of religious publications.

Ward also noted that the nature of the challenged expression is also relevant in evaluating this point, that is, "the distinction between a religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his soul." 1 F.3d at 878. *See also* Henderson, 379 F. 3d at 714 (finding that a prisoner forced to cut his hair would be considered "defiled" and thereafter unworthy to participate in the other major practices of his religion, the prisoner would effectively be denied all means of religious expression). Despite plaintiff's attempt in his motion brief to color the denial of showers as a peril to his soul, the many SDA religious excerpts and articles appended to and incorporated into his complaint clearly express that bodily cleanliness is only a single component of honoring the believer's body, given by God as a means for his service. *See, e.g.,* Trustees of Ellen G. White Publications, Counsels on Health at 1016 (Ellen G. White Publications 1957), *quoting* Ellen G. White, Review and Herald (December 1, 1896).  Further, plaintiff's included religious materials consistently speak not of daily showers, but of keeping the body clean by various means, including daily or weekly baths.   As a result, this prong does not weigh in plaintiff's favor.

**Impact of Accommodation.**  Plaintiff maintains that providing him with daily showers will have no impact on guards, other inmates, or the allocation of prison resources.  In doing so, he takes liberties with the truth.  Although a court evaluating a Rule 12(b)(6) motion to dismiss is instructed to assume the truth of all factual allegations of the plaintiff and the reasonable inferences to be drawn from them, it need not accept as true unreasonable inferences or conclusory allegations masquerading as facts.  Western Mining Council v. Watt, 643 F.2d 618, 614 (9th Cir.), *cert. denied*, 454 U.S. 1031 (1981).  When a party's factual allegations are blatantly inaccurate, a court is not required to accept them as true.  Scott v. Harris, 550 U.S. 372, 378-80 (2007).

Attempting to minimize the intensive supervision incorporated in SHU shower procedures, plaintiff contends both that showers are run daily from 2:30 p.m. to 9:00 p.m, and that showers require only five minutes per inmate and are over by 4:00 p.m. Both allegations cannot be correct. Further, consideration of plaintiff's factual contentions in light of applicable portions of CSPC's Operational Procedures contradict plaintiff's factual assertions. First, even though each inmate is entitled to five minutes in the shower, plaintiff's math is inaccurate since, at five minutes per single-occupant cell, the minimum shower time would be 160 minutes (2 hours, 40 minutes) or at least running from 2:30 p.m. to 5:10 p.m. Since all cells in CPSC SHU are not single occupancy, however, the minimum shower time would necessarily run well beyond 5:10 p.m. even if only the five-minute time for the actual shower is considered. But an accurate time calculation requires the addition of the time needed for officers to search and cuff each inmate; walk him to and from the shower; issue shavers and barbering tools; permit the inmate to shave or cut his hair; collect, sanitize, inspect and store the razor and barbering tools; inspect the shower stall for cleanliness and condition before and after each inmate's use; and return the inmate securely to his cell.

Choosing to characterize his request as a *de minimus* intrusion on correctional officers' time, plaintiff also ignores the disruption inherent in providing a single inmate with the privilege of daily showers even if that privilege is premised on the plaintiff's religious convictions. Because the shower schedule is managed by tier, plaintiff's favored treatment would be immediately apparent to all inmates on his tier. Avoiding a perception of favoritism is a legitimate penological goal since perceived favoritism may engender resentment, envy and intimidation. Friend, 923 F.2d at 128 (allowing Roman Catholic inmates to possess rosaries and scapulars in their cells despite prohibition against personal property not supplied by prison would create "an impression of favoritism toward Roman Catholic prisoners). *See also* Standing Deer, 831 F.2d at 1529 (upholding a ban on headgear in the prison dining hall against Native American inmates' free exercise challenge since "special arrangements for one group could create an appearance of favoritism that could generate resentment and unrest). Generating resentment, envy and intimidation in a maximum-security section populated by inmates unable or unwilling

to conform to prison rules surely is counter to penological objectives and weighs against plaintiff's requested accommodation.

**Alternative means of religious exercise.**  Plaintiff admits that he can accomplish hygiene on the days on which he is not scheduled to shower by means of a sponge bath in his cell, commonly referred to in prison as a "bird bath."  Common experience tells us that persons both in and out of prison frequently accomplish personal cleanliness by washing in a sink. Plaintiff vehemently rejects sponge baths as an inconvenient alternative, however, arguing (1) that he is not permitted washcloths in SHU; (2) that his towels are mean for drying, not washing; (3) that washing in the cell sink will spill dirty body water on his cell floor but he is only permitted to clean his cell once a week; and (4) that he cannot take a "bird bath" because, unlike a bird, he cannot stand in his sink.  Plaintiff further asserts that washing in his cell would require installation of bathing facilities and provision for the cell to be sanitized after the bath.  His contentions lack merit.

**Legitimate refusal to accommodate.**  Weighing the Turner factors in this case inevitably leads to a conclusion that plaintiff cannot, as a matter of law, establish that defendant's refusing to authorize daily showers violates plaintiff's constitutional right to free exercise of religion.

## IV. Qualified Immunity

Although defendant maintains that plaintiff has not established that his First Amendment rights were violated, defendant argues that even if plaintiff's claims were found valid, defendant would be entitled to qualified immunity since the right of an individual SHU inmate to daily showers for religious reasons was not clearly established at the time that he considered plaintiff's request.

Plaintiff has the burden of proving that the alleged constitutional violation was clearly established at the time of the defendant's alleged misconduct.  Camarillo v. McCarthy, 998 F.2d 638, 639 (9th Cir. 1993).  Plaintiff clearly misunderstands the nature of a clearly established constitutional violation, responding that defendant cannot be found to be immune for three reasons: (1) defendant never spoke with plaintiff regarding his religious beliefs on daily showers; (2) defendant is a Protestant chaplain whose job is "to know about all Christian Protestant

11

Churches teachings including SDAs;" and (3) SHU inmates are entitled to practice their religious beliefs as established by Cal. Code Regs. tit. 15, § 3343(k) and OP804.[3]

"Qualified immunity balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, ___ U.S. ___, 129 S.Ct. 808, 815 (2009). The objective of the qualified immunity doctrine is ensuring that insubstantial claims against government officials are resolved prior to discovery. Anderson v. Creighton, 483 U.S. 635, 640 n. 2 (1987). Meeting the objective requires resolving questions of immunity at the earliest possible stage in litigation. Hunter v. Bryant, 502 U.S. 224, 227 (1991)(*per curiam*).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Government officials possess qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "does not bar actions for declaratory or injunctive relief." Presbyterian Church (U.S.A.) v. United States, 870 F.2d 518, 527 (9th Cir. 1989).

" The 'salient question' is whether the state of the law at the time gives officials 'fair warning' that their conduct is unconstitutional." Grimes v. Tilton, 2009 WL 650591 at *13 (S.D. Cal. March 12, 2009) (Civ. No. 06-2309 BTM(LSP)), *quoting* Hope v. Pelzer, 536 U.S. 730, 740 (2002). A district court need only determine whether, "in light of clearly established principles governing the conduct in question, the [defendant] objectively could have believed that his conduct was lawful." ActUp!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir. 1995). *See also* Anderson, 483 U.S. at 641. If the court determines that the law was clearly established, qualified immunity does not exist since a reasonably competent public official should know the law governing his or her actions. Harlow, 457 U.S. at 818-19. And, even if the plaintiff has alleged a violation of a clearly established right, a public official may still be protected by qualified immunity if the mistake about what the law requires was reasonable. *See* Saucier v. Katz, 533

---

[3] C-OP 804 establishes policies and procedures to meet the religious and spiritual needs of CSPC inmates.

U.S. 194, 205 (2001); Kennedy v. City of Ridgefield, 439 F.3d 1055, 1061 (9th Cir. 2006); Wilkins v. City of Oakland, 350 F.3d 949, 955 (9th Cir. 2003), *cert. denied*, 543 U.S. 811 (2004); Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th Cir. 2002); Newell v. Sauser, 79 F.3d 115, 118 (9th Cir. 1996); Schroeder v. McDonald, 55 F.3d 454, 461-62 (9th Cir. 1995). If reasonable government officers could disagree on the issue, a defendant can still be protected by qualified immunity as long as his decision was objectively reasonable. Act Up!/Portland, 988 F.2d at 872.

As expressed by its name, qualified immunity is "*immunity from suit* rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1982). Whether the defendant violated a constitutional right and whether the right was clearly established at the time of the violation are purely legal questions. *See* Kennedy, 439 F.3d at 1059-60; Cunningham v. City of Wenatchee, 345 F.3d 802, 807-10 (9th Cir. 2003), *cert. denied*, 541 U.S. 2010 (2004); Serrano v. Francis, 345 F.3d 1071, 1080 (9th Cir. 2003), *cert. denied*, 543 U.S. 825 (2004); Martinez v. Stanford, 323 F.3d 1178, 1183 (9th Cir. 2003).

The determination of qualified immunity is distinct from the merits of the underlying claim. *See* Behrens v. Pelletier, 516 U.S. 299, 308 (1996); Mitchell, 472 U.S. at 527-28.

> An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged action.

Id. at 528.

Once a court has determined that the defendant did not violate a clearly established constitutional right, the underlying claim becomes immaterial. Camarillo, 998 F.2d at 640.

A court must first clearly identify the right that was allegedly violated. To do so, a court must define the right more narrowly than the constitutional provision guaranteeing the right, but more broadly than the total factual circumstances surrounding the alleged violation. Watkins v. City of Oakland, California, 145 F.3d 1087, 1092-93 (9th Cir 1998); Carnell v. Grimm, 74 F.3d 977, 979-80 (9th Cir. 1996); Kelley v. Borg, 60 F.3d 664, 667 (9th Cir. 1995); Camarillo, 998 F.2d at 640. The Supreme Court has observed:

> The operation of this standard [clearly established law] . . . . depends substantially on the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiff would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

Anderson, 483 U.S. at 639.

Accordingly, the constitutional right to be addressed in this instance is not plaintiff's right to free exercise of religion but plaintiff's right to exercise his religious beliefs through a daily shower.

Once the right in question has been identified, the court must determine whether it was clearly established.[4] The determination is a question of law for the court. Act Up!/Portland, 988 F.2d at 873. The court's inquiry must be "objective but fact-specific." Fogel v. Collins, 531 F.3d 824, 833 (9th Cir. 2008). The court must analyze whether the public officials acted "reasonably under settled law in the circumstances," not whether a more reasonable interpretation of the events can be imagined in hindsight. Hunter, 502 U.S. at 537.

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right." Anderson, 483 U.S. at 640. *See also* Hope, 536 U.S. at 739; CarePartners, LLC v. Lashway, 545 F.3d 867, 876 (9th Cir. 2008), *cert. denied*, 129 S.Ct. 2382 (2009); Fogel, 531 F.3d at 833; Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); Kennedy, 439 F.3d at 1060-61; Estate of Ford, 301 F.3d at 1050; Sorrels v. McKee, 290 F.3d 965, 970 (9th Cir. 2002). "[A] clearly-established right exists if 'in light of pre-existing law the unlawfulness [is] apparent.'" Fogel, 531 F.3d at 833, *quoting* Wilson v. Layne, 526 U.S. 603, 615 (1999). *See also* Hope, 436 U.S. at 741; Sorrels, 290 F.3d at 970. A prior decision clearly establishes a right if its facts are not fairly

---

[4] Until earlier this year, the Saucier decision required that the court determine whether the right was actually violated before determining whether the right was "clearly established." Saucier, 533 U.S. at 201. In Pearson, the Supreme Court reconsidered Saucier, holding that, while a court may still choose to first determine whether the facts establish that a constitutional violation occurred, the two-step Saucier procedure was not mandatory. 129 S.Ct at 818.

distinguishable from those of the case at hand. Saucier, 533 U.S. at 202. "In other words, there must be some parallel or comparable factual pattern to alert an officer that a series of actions would violate an existing constitutional right." Fogel, 531 F.3d at 833. "[I]f officers of reasonable competence could disagree on [the] issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986).

"Closely analogous pre-existing case law is not required to show that a right was clearly established." White v. Lee, 227 F.3d 1214, 1238 (9th Cir. 2000). If no binding precedent exists, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope, 536 U.S. at 739. Identifying an identical prior decision is not necessary. Anderson, 483 U.S. at 640. *See also* Kennedy, 439 F.3d at 1065-66; Motley v. Parks, 432 F.3d 1072, 1089 (9th Cir. 2005) (en banc); Sorrels, 290 F.3d at 970; Malik v. Brown, 71 F.3d 724, 727 (9th Cir. 1995); Browning v. Vernon, 44 F.3d 818, 823 (9th Cir. 1995). In such cases, the court must consider relevant decisions of both federal and state courts as well as the likelihood that the Supreme Court or the Ninth Circuit would decide the issue in favor of the party asserting the constitutional right. Elder v. Holloway, 510 U.S. 510, 512, 516 (1994). *See also* Hope, 536 U.S. at 739-46; Inouye, 504 F.3d at 714-17; Boyd v. Benton County, 374 F.3d 773, 781 (9th Cir. 2004); Osolinski v. Kane, 92 F.3d 934, 936, 938 (9th Cir. 1996).

Despite an exhaustive search, this court has been unable to identify any prior case in any federal or state court addressing whether an observant Seventh Day Adventist inmate has a right to a daily shower. Addressing requests for individual religious accommodations, court decisions have generally recognized that prison administrators need not permit every accommodation requested in the name of religious expression. Religious exercise has been repeatedly limited for reasons of safety and security. *See, e.g.,* Henderson, 379 F.3d at 713-714 (prohibition of long hair); Anderson, 123 F.3d at 1198-99 (prohibition of inmate-led religious services); Ward, 1 F.3d at 879 (prohibition against use of candles in cells); Friedman, 912 F.2d at 331-32 (prohibition against beards); Standing Deer, 831 F.2d at 1528-29; McCabe, 827 F.2d at 637 (prohibition against preaching racial hatred and violence); Allen, 827 F.2d at 567 (prohibition against sweat lodge attendance by Native American prisoners in disciplinary segregation).

In a recent case, an inmate claimed violation of his right to religious exercise after a correctional officer refused to allow a group of Muslim inmates to enter a day room at 4:00 a.m. for morning prayers. Saif'ullah v. Padaoan, 2007 WL 2429720 at *19-*22 (E.D. Cal. August 24, 2007), *report and recommendation adopted by* 2007 WL 3023342 (E.D. Cal. October 15, 2007)(CIV S-98-1322 MCE-GGH-P). Although the day room was freely available from 5:30 a.m. to 9:45 p.m. for a variety of purposes including prayer and group programs, its use was prohibited for security reasons during first watch when only two correctional officers were on duty. Id. at *19. During first watch, inmates were free to pray next to their bunks. Ibid. The court concluded that, even if it assumed that the officer had violated plaintiff's right to practice his religion, the officer acted reasonably "in abiding by the prison's policy with respect to day room hours." Id. at *23.

The right of religious accommodation has not been held limitless in other contexts, either. A district judge expressed the principle well in determining whether prison officials were entitled to immunity in a case in which a Muslim inmate sought (1) to attend services specific to followers of the Nation of Islam (as opposed to the services open to all Islamic inmates); (2) to wear a colored kufi (skullcap) in lieu of the white kufi available to inmates; (3) to be permitted more than three types of prayer oils available to Muslim inmates; and (4) to appeal a DOC policy regarding attendance at certain cultural events. Mitchell v. Department of Corrections, 2008 WL 4527863 (E.D.Wash. October 3, 2008)(No. CV-07-0107-LRS). The court observed:

> Defendants concede that the law is clearly established that an offender has a right to exercise his religious beliefs while incarcerated and that Defendants cannot substantially burden that exercise absent a compelling government interest. Defendants argue, though, that the law is not clearly established that an offender is entitled to every accommodation he seeks for his religious exercise and that Defendants cannot place limits on the accommodations provided. Defendants assert that there is no case law to support Plaintiff's assertion that he must be permitted to have NOI Jumah, a colored kufi and any prayer oils (beyond the three types–musk, rose and jasmine–already available) he wishes. Defendants conclude, and the Court agrees, that the individual Defendants are clearly entitled to qualified immunity.

Id. at *7.

In the absence of any specific pre-existing legal guidance, a Seventh Day Adventist's right to daily showers cannot be said to have been clearly established when defendant declined to

accommodate plaintiff's request.  Nor can defendant's actions be found to have been unreasonable.  Having previously addressed various requests for accommodation of plaintiff's religious beliefs and having approved plaintiff's request for a religious diet, defendant knew plaintiff to be an observant Seventh Day Adventist.  Upon receipt of plaintiff's request for daily showers, defendant, who is apparently not a Seventh Day Adventist, consulted three SDA leaders for guidance, all of whom advised defendant that daily showers were not a requirement for Seventh Day Adventists.

Defendant is protected by qualified immunity.

### V.    Conclusion and Recommendation

For the reasons set forth herein, the court HEREBY RECOMMENDS that:

1. Defendant's motion to dismiss for failure to state a claim, filed February 18, 2009, be GRANTED; and

2. Plaintiff's complaint shall be dismissed, with prejudice, for failure to state a claim upon which relief can be granted.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **August 25, 2009**                     /s/ **Gary S. Austin**
                                                UNITED STATES MAGISTRATE JUDGE